**EXHIBIT A**

**AFFIDAVIT OF DAVID X. O'NEILL**

I, David X. O'Neill, being duly sworn, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately twenty years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

3. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

   a. $71,010 in United States currency, seized from Michael C. Dorian at Logan International Airport in Boston, Massachusetts on August 19, 2016 (the "Currency").

4. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

5. This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the Massachusetts State Police ("MSP") and the LATF, and my review of records and reports relating to the investigation.

6. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate such a violation.

## Seizure of the Currency

7. On August 19, 2016, JetBlue Airlines Flight #19 from Boston, Massachusetts, to San Diego, California, was scheduled to depart Logan International Airport at 4:55 PM. On that same day, Michael C. Dorion ("Dorion") purchased a one-way ticket on Flight #19.

8. On August 19, 2016, Dorion arrived at Terminal C and proceeded to the security line to be screened by the Transportation Security Administration ("TSA"). The state of California, where Dorian was travelling, has been identified by the MSP as a source area for marijuana. The LATF has seized and successfully forfeited as drug proceeds and/or currency intended to be used in furtherance of drug trafficking, hundreds of thousands of dollars traveling through Logan Airport to destinations throughout the states of California, Washington, and Oregon.

9. At approximately 4:00 p.m., MSP Trooper Christopher Fraser ("Trooper Fraser") and I were dispatched to the Terminal C TSA passenger screening checkpoint to investigate the possession of a large amount of United States currency. Subsequently, Trooper Fraser and I responded to the terminal and interviewed Dorion regarding his travel to San Diego. Prior to the interview, I informed Dorion that he was not under arrest. I asked Dorion if he would consent to speak with me and Trooper Fraser, and Dorion consented.

10. Initially, Dorion was cooperative and calm. As the interview progressed, however, Dorion became visibly increasingly nervous.

11. Dorion stated that he was traveling to San Diego to meet with two friends whom he identified by name, although Dorion stated that he only knew the first name of one of the individuals. Dorion admitted that he purchased a one-way ticket through Expedia on the same day of travel. Based on my training and experience, individuals involved in drug trafficking, including the transportation of drug proceeds and currency intended to be used in drug trafficking, often book one-way tickets on or very near the date of travel. Such one-way ticket purchases by narcotics traffickers are especially common for travel to certain marijuana source cities, including San Diego, California.

12. Dorion said that he was in possession of $60,000. He stated that the purpose of the trip was to meet up with the friends he previously identified, and party in Tijuana, Mexico. Dorion stated that he rented a room for two nights at the Quality Inn located in San Diego. At this point in the interview, Dorion appeared calm and confident.

13. I asked Dorion if I could see the $60,000, and Dorion consented to a search of his bags. Inside Dorion's carry-on bag, I saw two large plastic self-sealing envelopes. Each envelope was packed tightly. Dorion stated that the money was located in the sealed envelopes.

14. With Dorion's consent, I opened the envelopes. Located inside each envelope was a large sum of bulk cash that was banded together with elastic bands. I also saw that the cash was comprised of mostly twenty dollar bills. A quantity of suspected edible marijuana was also found individually wrapped in a plastic container inside Dorion's carry-on bag. I believed it to be edible marijuana based on my training and experience in the recognition of controlled substances, including edible marijuana, and because this substance was packaged in a similar fashion to other confirmed edible marijuana I have observed in the past. During the interview, Dorion admitted to smoking marijuana.

15. Dorion said that he was employed as an engineer by INIX Inc. located in Canton, Massachusetts, and he provided a business card with the same information. Dorion said that he has

known one of the people he was planning to visit, Luis, for approximately two years, but he was unable or unwilling to provide Luis' last name. Dorion stated that he had not yet rented a car in San Diego. When asked where he was planning to keep the cash, Dorion said that he planned to keep it in a motel room safe that he assumed would be available in the room.

16. Trooper Fraser and I continued to ask Dorion more questions about his trip, and I saw Dorion's demeanor change. We asked Dorion about his relationship with the two people he said he was planning to meet and about their planned trip to San Diego. Dorion was unable to provide plausible answers to simple questions such as how long he had known the two individuals, what they planned to do, how the individuals planned to arrive there, where the other individuals planned to stay, and other simple questions about his purported plans.

17. We also questioned Dorion about the $60,000, such as where the cash was kept and how the cash was aggregated and earned prior to his arrival at the airport. Dorion insisted that the cash was his. He stated that he owns rental property in Allston, Massachusetts and that he earns an annual income of $113,000 as an engineer. Although Dorion said that he had a bank account, he also stated that the money was not withdrawn from his bank account. Rather, Dorion stated that the money was kept in a safe deposit box located at a bank in Watertown, Massachusetts. Dorion stated that he withdrew the cash from the box that same day and that an additional $20,000 remained in the safe deposit box.

18. When asked whether he filed his 2015 tax returns, Dorion admitted that he had not.

19. After this brief pause, Dorion then confirmed that he was not being truthful and announced that he wanted to tell the truth. He then stated that the intention of his trip was not to meet with his friends in San Diego, or to go to Tijuana as he had previously reported to us. Rather, Dorion now stated that he had business in Los Angeles. Dorion said that the cash was intended to purchase used data center computer equipment on the "gray market." Dorion explained that the business in which

4

he intended to engage was not illegal but was not approved by the former owners of the computer equipment. It is highly unlikely that the owners of the computer equipment would approve of Dorion's acquisition of the computer equipment and his subsequently profiting from its resale. Although they might not seek prosecution for this act they would not allow it to happen if they were aware of it. Dorion stated that he intended to meet with a man, whom he did not want to identify, in Los Angeles who would sell him various computer components that Dorion planned to transport back to Massachusetts where he would re-sell them for a profit. As Dorion was explaining his plan, the investigators noticed that his physical expressions of nervousness subsided. However, when more detailed questions were asked about his newly-reported plans, Dorion again displayed the same nervous behavior as before. Based on my training and experience, based on his nervous behavior and inconsistent stories, I believed Dorion was attempting to deceive us.

20.     Dorion refused to identify the man from whom he was purchasing the computer components. Based on my training and experience, this was unusual and another indication that Dorion was attempting to deceive us. Dorion explained that his unwillingness to identify his contact was because the business that they were planning to engage in was in a "gray area." Dorion stated that what they were doing was not illegal but would be frowned upon by both his and his contact's employers.

21.     Dorion stated that his contact was employed at Lions Gate in California. I asked Dorion to call him so that I could verify his story. Initially, Dorion refused. However, eventually, Dorion attempted to call his contact. I watched as Dorion held his phone and motioned with his fingers as if he was dialing his phone. After putting his phone to his ear, Dorion informed me that his contact was not answering.

22.     At this time, Dorion's nervous ticks were very apparent to me. His complexion changed from ordinary to red, his arm was shaking, and his jaw was trembling. I asked Dorion to

place the call again and to use the speaker feature of his cell phone. Dorion consented. At that time, I was able to view the screen on the phone and saw that Dorion attempted to call "Alec Everetts" at a number beginning with area code 774. I knew that area code 774 was associated with south-central and southeastern Massachusetts and not California. I was also able to view the entire phone number. Again, the phone call was unsuccessful.

23. At this time, I told Dorion that I saw the name and telephone number of the person he was trying to call. I asked Dorion why, if his contact lived and worked in the Los Angeles area, his contact had a telephone number with an area code 774, which serviced south-central and southeastern Massachusetts. Dorion did not answer and appeared extremely flustered.

24. I informed Dorion that the Currency was being seized and that he was not under arrest and was welcome to travel back to the MSP Troop F Barracks (the "barracks") where the Currency would be examined by a drug detection canine. I further explained to Dorion that after the dog examined the cash, it would be counted and a receipt would be provided to him. Dorion ultimately accepted our offer to come to the barracks, and we transported the Currency and Dorion to the barracks.

25. While at the barracks, Dorion stated that he had a storage unit at a CubeSmart located in South Boston and paid approximately $200 to $300 per month for the space. He stated that he used the space to store his gray-market computer components prior to resale.

26. A drug detection canine was requested to respond to the MSP barracks. The Currency was concealed from view. Trooper William McSweeney ("Trooper McSweeney") and his K-9 Scully explored the MSP barracks and informed the investigators that Scully located the concealed Currency and alerted to it based on the presence of a narcotic odor on the Currency.

27. Trooper McSweeney has been employed with the MSP for 10 years and assigned to the K-9 unit for the last 4 years. Trooper McSweeney advised that K-9 Scully is a 5 1/2-year-old

male Belgian Malinois and that he uses K-9 Scully in the detection of controlled substances in different situations, including, but not limited to interdiction investigations.

28.   Trooper McSweeney and K-9 Scully have attended and successfully completed a 320-hour course in narcotic detection including marijuana, cocaine, heroin and methamphetamine.  In June 2012, Trooper McSweeney and K-9 Scully received accreditation for narcotic odor detection through the New England State Police Conference and continue to obtain re-certification every year, most recently in May 2016.  This certification is current.

29.   Since the initial training class, Trooper McSweeney and K-9 Scully have maintained and updated training at a minimum of two days per month.  Trooper McSweeney advised that searches conducted by K-9 Scully have led to the seizure of marijuana, cocaine, methamphetamine and heroin.  Trooper McSweeney advised that K-9 Scully is a well-trained and reliable canine.

30.   Following the positive reaction by K-9 Scully, the Currency was sorted and counted. The total was $71,010 and not $60,000 as reported by Dorion.  Based on my training and experience, individuals traveling with large amount of currency for legitimate purposes know how much money they are carrying while individuals carrying drug proceeds often do not know the amount they possess, as was the case with Dorion.  I believe that Dorion either did not know how much currency he had in his bag, or did not want to reveal the true amount to me.

31.   The denominations were recorded as follows:

| Denomination (United States Currency) | Number | Total | Approximate Percentage of $71,010 |
|---|---|---|---|
| $100 bills | 11 | $1,100 | 1.5% |
| $50 bills | 35 | $1,750 | 2.5% |
| $20 bills | 3,408 | $68,160 | 96.0% |
| **Total:** | 3,454 | $71,010 | 100.0% |

32.   Approximately 96 percent of the $71,010 was comprised of $20 bills.  Based on my training and experience, I know that street-level drug transactions often involve lower

denominations of currency and that it is common for drug traffickers to possess many lower-denomination bills, such as the 3,408 $20 bills that Dorion possessed. I am also aware that banks and other financial institutions often provide large sums of cash using higher-denomination bills, such as $100 bills, of which Dorion only possessed 11.

33. Following the interview, in approximately late August 2016, I contacted Lions Gate located in Santa Monica, California and learned that an "Alec Everetts" was not currently employed by Lions Gate.

34. I also later located and interviewed an individual named Alec Everts ("Everts"). It should be noted that Everts spells his name differently than the way I observed the name spelled in Dorion's phone. Everts said that he previously worked at Lions Gate and did know Dorion years ago. Everts did not, however, otherwise corroborate Dorion's statement to me about the alleged "gray market" purpose of Dorion's travel to California.

35. In addition, I also later contacted the CubeSmart storage unit location Dorion identified and learned that, according to its records, Dorion was not a customer at that location at any time during the last ten years.

36. In addition, on several occasions I attempted to call the 774 telephone number Dorion identified as belonging to his contact. Each time, a recorded message stated that the number was not in service.

## Conclusion

37. Based upon the information set forth above, probable cause exists to believe that the defendant Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the penalty and pains of perjury this 12th day of January, 2017.

David X. O'Neill
Special Agent
Drug Enforcement Administration